# Harmony V. Peddy v. Aaron's, Inc.
## Civil Action File No. 2:18-cv-01625-SSV-JVW

## Exhibit "1"

EEOC Form 161 (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Harmony V. Peddy<br>8007 Double Lake Road<br>Picayune, MS 39466 | From: | New Orleans Field Office<br>Hale Boggs Federal Building<br>500 Poydras Street, Room 809<br>New Orleans, LA 70130 |
|---|---|---|---|

|  | On behalf of person(s) aggrieved whose identity is *CONFIDENTIAL (29 CFR §1601.7(a))* |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 461-2016-01866 | Ligita D. Landry,<br>Supervisory Investigator | (504) 595-2876 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| [X] | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [ ] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [ ] | Other *(briefly state)* |

## - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Keith T. Hill,
Director

**NOV 1 3 2017**

*(Date Mailed)*

Enclosures(s)

cc:
Suzanne D. Taylor
**Employment Lead Counsel
Aaron's, Inc.**
400 Galleria Parkway
Suite 300
Atlanta, GA 30339

LAURIE W. MASCHEK
**Attorney at Law**
1350 Gause Boulevard West
Slidell, LA 70460

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):**   The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

**If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.**

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

➢ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.

➢ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities"** now include the operation of major bodily functions, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

➢ **Only one** major life activity need be substantially limited.

➢ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

➢ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.

➢ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage:**

➢ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

➢ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

➢ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.

➢ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

*Note:   Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.*   For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

 

EEOC Form 5 (11/09)

| | |
|---|---|
| # CHARGE OF DISCRIMINATION | Charge Presented To:   Agency(ies) Charge No(s): |

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To:
- ☐ FEPA
- ☒ EEOC

Agency(ies) Charge No(s): **461-2016-01866**

### Louisiana Commission On Human Rights
*State or local Agency, if any*                          and EEOC

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Mrs. Harmony V. Peddy** | **(615) 415-4271** | **1975** |

| Street Address | City, State and ZIP Code |
|---|---|
| **8007 Double Lake Road, Picayune, MS 39466** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **AARON'S RENTAL** | **500 or More** | 6 78-402-3000 |

| Street Address | City, State and ZIP Code |
|---|---|
| **185 Gause Blvd.,  Slidell, LA 70460** | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

- ☐ RACE
- ☐ COLOR
- ☐ SEX
- ☐ RELIGION
- ☐ NATIONAL ORIGIN
- ☒ RETALIATION
- ☐ AGE
- ☒ DISABILITY
- ☐ GENETIC INFORMATION
- ☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **03-24-2016**   Latest **03-24-2016**

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

**I began my employment with Aaron's Rental on August 22, 2000.  Upon returning to work after maternity leave on May 7, 2015, I explained my medical condition to my new boss, Justin Hafer.  I informed him that there were some things I could not do.  I explained my disability and how I could not do spreadsheets; word finding issues; and how it takes me longer to learn new things like new computer programs or new ways of doing things.  He looked over the paper work and told me that he could work with it.  Everything was going fine until after my boss sent me an e-mail stating that he was upset because I did not send out information that he had requested.  I contacted our home office AR department and let them know that I was feeling as if my job was in jeopardy because of my disability.  I was informed to get an updated workplace accommodation sheet from my doctor because the one I had was too old.  AR went over my accommodations with my boss.  At this point, he said he would have Melissa do all of my spreadsheets for me.  At the beginning of December 2016, Mr. Hafer failed to accommodate me by requesting that I put a spreadsheet at the bottom of my daily "Marketing Today" e-mail instead of the self-populating list of stores,  I was expected to update the**

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| | *Laurie W. Maschek* |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| | |
| X 3-2-17                    X *(signature)* | Laurie W. Maschek<br>Notary Public<br>Bar Roll # 26681<br>Notary # 065933<br>State of Louisiana<br>My Commission Is For Life |
| Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)*  3/2/17 |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 461-2016-01866 |

| Louisiana Commission On Human Rights | and EEOC |
|---|---|
| State or local Agency, if any | |

spreadsheet on my days off.  I became overwhelmed.  I went to my doctor and informed him of what was happening and he put me on disability.  On March 24, 2016, I was constructively discharged as a Divisional S.M. earning $99,196.80 per year.  The company employs over 500 persons.

No reason was given for the action taken against me.

I believe I have been discriminated against because of my disability, and retaliated against, in violation of the Americans with Disabilities Act, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 3-2-17<br>Date | Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)<br>3/2/17 | Laurie W. Maschek<br>Notary Public<br>LA Bar Roll # 26681<br>Notary # 66993<br>State of Louisiana<br>My Commission Is For Life |

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 461-2016-01866 |

**Louisiana Commission On Human Rights** and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Mrs. Harmony V. Peddy** | **(615) 415-4271** | **1975** |

| Street Address | City, State and ZIP Code |
|---|---|
| **8007 Double Lake Road, Picayune, MS 39466** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **AARON'S RENTAL** | **500 or More** | **(985) 781-0214** |

| Street Address | City, State and ZIP Code |
|---|---|
| **185 Gause Blvd.,  Slidell, LA 70460** | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

## DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☒ DISABILITY   ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| **03-24-2016** | **03-24-2016** |

☐ CONTINUING ACTION

## THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I began my employment with Aaron's Rental on August 22, 2000.  Upon returning to work after maternity leave on May 7, 2015, I explained my medical condition to my new boss, Justin Hafer.  I informed him that there were some things I could not do.  I explained my disability and how I could not do spreadsheets; word finding issues; and how it takes me longer to learn new things like new computer programs or new ways of doing things.  He looked over the paper work and told me that he could work with it.  Everything was going fine until after my boss sent me an e-mail stating that he was upset because I did not send out information that he had requested.  I contacted our home office AR department and let them know that I was feeling as if my job was in jeopardy because of my disability.  I was informed to get an updated workplace accommodation sheet from my doctor because the one I had was too old.  AR went over my accommodations with my boss.  At this point, he said he would have Melissa do all of my spreadsheets for me.  At the beginning of December 2016, Mr. Hafer failed to accommodate me by requesting that I put a spreadsheet at the bottom of my daily "Marketing Today" e-mail instead of the self-populating list of stores,  I was expected to update the

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

| Date | Charging Party Signature |
|---|---|

EEOC Form 5 (11/09)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 461-2016-01866 |

**Louisiana Commission On Human Rights** and EEOC

*State or local Agency, if any*

spreadsheet on my days off. I became overwhelmed. I went to my doctor and informed him of what was happening and he put me on disability. On March 24, 2016, I was constructively discharged as a Divisional S.M. earning $99,196.80 per year. The company employs over 500 persons.

No reason was given for the action taken against me.

I believe I have been discriminated against because of my disability, and retaliated against, in violation of the Americans with Disabilities Act, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| X_____ Date   X_____ Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

CP Enclosure with EEOC Form 5 (11/09)

PRIVACY ACT STATEMENT:  Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.   FORM NUMBER/TITLE/DATE.  EEOC Form 5, Charge of Discrimination (11/09).

2.   AUTHORITY.  42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3.   PRINCIPAL PURPOSES.  The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.   ROUTINE USES.  This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions.  A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.   WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.  Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements.  You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 461-2016-01866 |

| Louisiana Commission On Human Rights | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Mrs. Harmony V. Peddy** | **(615) 415-4271** | **1975** |

| Street Address | City, State and ZIP Code |
|---|---|
| **8007 Double Lake Road, Picayune, MS 39466** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others.  (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **AARON'S RENTAL** | **500 or More** | **(985) 781-0214** |

| Street Address | City, State and ZIP Code |
|---|---|
| **185 Gause Blvd.,  Slidell, LA 70460** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☒ DISABILITY   ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **03-24-2016**   Latest **03-24-2016**
☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began my employment with Aaron's Rental on August 22, 2000.  Upon returning to work after maternity leave on May 7, 2015, I explained my medical condition to my new boss, Justin Hafer.  I informed him that there were some things I could not do.  I explained my disability and how I could not do spreadsheets; word finding issues; and how it takes me longer to learn new things like new computer programs or new ways of doing things.  He looked over the paper work and told me that he could work with it.  Everything was going fine until after my boss sent me an e-mail stating that he was upset because I did not send out information that he had requested.  I contacted our home office AR department and let them know that I was feeling as if my job was in jeopardy because of my disability.  I was informed to get an updated workplace accommodation sheet from my doctor because the one I had was too old.  AR went over my accommodations with my boss.  At this point, he said he would have Melissa do all of my spreadsheets for me.  At the beginning of December 2016, Mr. Hafer failed to accommodate me by requesting that I put a spreadsheet at the bottom of my daily "Marketing Today" e-mail instead of the self-populating list of stores,  I was expected to update the

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| ⟋ Date    ⟋ Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 461-2016-01866 |

**Louisiana Commission On Human Rights** and EEOC

*State or local Agency, if any*

spreadsheet on my days off. I became overwhelmed. I went to my doctor and informed him of what was happening and he put me on disability. On March 24, 2016, I was constructively discharged as a Divisional S.M. earning $99,196.80 per year. The company employs over 500 persons.

No reason was given for the action taken against me.

I believe I have been discriminated against because of my disability, and retaliated against, in violation of the Americans with Disabilities Act, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| X _____   X _____<br>    Date           Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.  **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2.  **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3.  **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.  **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.  **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

## NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## INTAKE QUESTIONNAIRE

Please immediately complete this entire form and return it to the U.S. Equal Employment Opportunity Commission ("EEOC"). **REMEMBER**, a charge of employment discrimination must be filed within the time limits imposed by law, within 180 days or in some places within 300 days of the alleged discrimination. When we receive this form, we will review it to determine EEOC coverage. **Answer all questions completely, and attach additional pages needed to complete your responses. If you do not know the answer to a question, answer by stating "not known." If a question is not applicable, write "N/A." (PLEASE PRINT)**

### 1. Personal Information

Last Name: _Peddy_   First Name: _Harmony_   MI: _✓_

Street or Mailing Address: _8007 Double Lake Rd_   Apt or Unit #: _____

City: _Picayune_   County: _Pearl River_   State: _MS_   Zip: _39466_

Phone Numbers: Home: (___) _____   Work: (___) _____

Cell: (_615_) _415-4271_   Email Address: _____

Date of Birth: _02-15-1975_   Sex: ☐ Male ☑ Female   Do You Have a Disability? ☑ Yes ☐ No

**Please answer each of the next three questions.**  i. Are you Hispanic or Latino? ☐ Yes ☑ No

ii. What is your Race?   Please choose all that apply. ☐ American Indian or Alaskan Native   ☐ Asian   ☑ White
☐ Black or African American   ☐ Native Hawaiian or Other Pacific Islander

iii. What is your National Origin (country of origin or ancestry)? _U S A_

**Please Provide The Name Of A Person We Can Contact If We Are Unable To Reach You:**

Name: _Ann Ryan_   Relationship: _Mother-in-law_

Address: _8007 Double Lake Rd_   City: _Picayune_   State: _MS_ Zip Code: _39466_

Home Phone: (___) _____   Other Phone: (_615_) _310-8775_

### 2. I believe that I was discriminated against by the following organization(s): (Check those that apply)

☑ Employer   ☐ Union   ☐ Employment Agency   ☐ Other (Please Specify) _____

**Organization Contact Information** (If the organization is an employer, provide the address where you actually worked. If you work from home, check here ☐ and provide the address of the office to which you reported.) **If more than one employer is involved, attach additional sheets.**

Organization Name: _Aaron's_

Address: _185 Gause Blvd. W._   County: _St. Tammany Parish_

City: _Slidell_   State: _LA_ Zip: _70458_   Phone: (_985_) _718-4308_

Type of Business: _Furniture lease_ Job Location if different from Org. Address: _Traveling to 124 Store loca_

Human Resources Director or Owner Name: _Danielle_   Phone: (_985_) _718-4308_

**Number of Employees in the Organization at All Locations:** Please Check (✓) One

☐ Fewer Than 15   ☐ 15 – 100   ☐ 101 – 200   ☐ 201 – 500   ☑ More than 500

### 3. Your Employment Data (Complete as many items as you are able.) Are you a federal employee? ☐ Yes ☐ No

Date Hired: _8-22-2000_   Job Title At Hire: _CSR_

Pay Rate When Hired: _$8.00 hr_   Last or Current Pay Rate: _99,196.80 Yr_

Job Title at Time of Alleged Discrimination: _Divisional S.M_   _Placed on disability_ Date Quit/Discharged: _3/24/2016_

Name and Title of Immediate Supervisor: _Justin Hafer_

**If Job Applicant,** Date You Applied for Job _____   Job Title Applied For _____

**4. What is the reason (basis) for your claim of employment discrimination?**

*FOR EXAMPLE, if you feel that you were treated worse than someone else because of race, you should check the box next Race. If you feel you were treated worse for several reasons, such as your sex, religion and national origin, you should che all that apply. If you complained about discrimination, participated in someone else's complaint, or filed a charge discrimination, and a negative action was threatened or taken, you should check the box next to Retaliation.*

☐ Race  ☐ Sex  ☐ Age  ☒ Disability  ☐ National Origin  ☐ Religion  ☒ Retaliation  ☐ Pregnancy  ☐ Color (typically a difference in skin shade within the same race) ☐ Genetic Information; circle which type(s) of genetic information is involved: i. genetic testing   ii. family medical history   iii. genetic services (genetic services means counseling, education or testing)

If you checked color, religion or national origin, please specify:_____

If you checked genetic information, how did the employer obtain the genetic information?_____

_____

Other reason (basis) for discrimination (Explain): _Explained on attached pages._

**5. What happened to you that you believe was discriminatory?** Include the date(s) of harm, the action(s), and the name(s) and title(s) of the person(s) who you believe discriminated against you. **Please attach additional pages if needed.**
*(Example: 10/02/06 – Discharged by Mr. John Soto, Production Supervisor)*

**A. Date:** _Sept. 3, 2015_ **Action:** _Got upset with me, e-mail attached, because I could not do a simple calculation._

**Name and Title of Person(s) Responsible:** _Justin Hafer, Divisional Vice President_

**B. Date:** _March 22nd 2016_ **Action:** _The last morning I sent out the morning spreadsheet after my Workplace Accommodations said I was supposed to have someone else do those._

**Name and Title of Person(s) Responsible** _Justin Hafer, Divisional_

**6. Why do you believe these actions were discriminatory?** Please attach additional pages if needed. _Vice Preside._
_Explained in attached pages_

**7. What reason(s) were given to you for the acts you consider discriminatory?  By whom?  His or Her Job Title?**
_Justin said he was going to have to demote me because he needed a DSM that could do spread-sheets._

**8. Describe who was in the same or similar situation as you and how they were treated.** For example, who else applied for the same job you did, who else had the same attendance record, or who else had the same performance? Provide the race, sex, age, national origin, religion, or disability of these individuals, if known, and if it relates to your claim of discrimination. For example, if your complaint alleges race discrimination, provide the race of each person; if it alleges sex discrimination, provide the sex of each person; and so on. Use additional sheets if needed.

Of the persons in the same or similar situation as you, who was treated *better* than you?

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |
|---|---|---|---|
| A. _I do not know of anyone else with a head injury. I was the only DSM in our 5_ | | | |
| B. _State area._ | | | |

**Of the persons in the same or similar situation as you, who was treated *worse* than you?**

Full Name          Race, Sex, Age, National Origin, Religion or Disability   Job Title          Description of Treatment

A. _____

_____

B. _____

_____

**Of the persons in the same or similar situation as you, who was treated the *same* as you?**

Full Name          Race, Sex, Age, National Origin, Religion or Disability   Job Title          Description of Treatment

A. _____

_____

B. _____

_____

**Answer questions 9-12 only if you are claiming discrimination based on disability. If not, skip to question 13. Please tell us if you have more than one disability. Please add additional pages if needed.**

**9. Please check all that apply:**
- ☑ Yes, I have a disability
- ☐ I do not have a disability now but I did have one
- ☐ No disability but the organization treats me as if I am disabled

**10. What is the disability that you believe is the reason for the adverse action taken against you? Does this disability prevent or limit you from doing anything?** (e.g., lifting, sleeping, breathing, walking, caring for yourself, working, etc.).

My disability keeps me from working with numbers, dyscalculia, driving at night, working on a computer for extended period, word finding issues, anxiety disorder

**11. Do you use medications, medical equipment or anything else to lessen or eliminate the symptoms of your disability?**
☑ Yes ☐ No

If "Yes," what medication, medical equipment or other assistance do you use?

Escitalopram, Xanex, Topomax, Flexoril

**12. Did you ask your employer for any changes or assistance to do your job because of your disability?**
☑ Yes ☐ No

If "Yes," when did you ask? 9-28-15  How did you ask (verbally or in writing)? in writing

Who did you ask? (Provide full name and job title of person)

Justin Hafer, Divisional Vice President

Describe the changes or assistance that you asked for: Attachment "C"

_____

How did your employer respond to your request? He increased my travel/job demand. Then eventually added a spread sheet back on. See Attached.

**13.** Are there any witnesses to the alleged discriminatory incidents?  If yes, please identify them below and tell us what they will say. (Please attach additional pages if needed to complete your response)

| Full Name | Job Title | Address & Phone Number | What do you believe this person will tell us? |
|---|---|---|---|

A. _Zeb Foti_   _ex Regional Manager_   _150 Southfield Parkway Lafayette, LA 70_
_337-501-7846_                        _They were trying to push me hard_
_enough that I would quit,_
B. _Dr. Randee L. Booksh   2626 Franklt St Ste 220 Metairie, LA 70002_
_Once they received the workplace accommod._
_the job duties changed so much they became obsolete_

**14.** Have you filed a charge previously on this matter with the EEOC or another agency?  ☐ Yes  ☑ No

**15.** If you filed a complaint with another agency, provide the name of agency and the date of filing: _____

**16.** Have you sought help about this situation from a union, an attorney, or any other source?  ☑ Yes  ☐ No
Provide name of organization, name of person you spoke with and date of contact. Results, if any?
_I have a lawyer helping me w/ the workers comp side, but_
_not this. No results yet except she did get me back mileage_
_Laurie Maschek._                        _from workers comp._

**Please check one of the boxes below to tell us what you would like us to do with the information you are providing on thi**
questionnaire.  If you would like to file a charge of job discrimination, you must do so either within 180 days from the day yo
knew about the discrimination, or within 300 days from the day you knew about the discrimination if the employer is located in
a place where a state or local government agency enforces laws similar to the EEOC's laws.  If you do not file a charge of
discrimination within the time limits, you will lose your rights.  If you would like more information before filing a charge
or you have concerns about EEOC's notifying the employer, union, or employment agency about your charge, you may
wish to check Box 1.  If you want to file a charge, you should check Box 2.

---

**BOX 1** ☐ I want to talk to an EEOC employee before deciding whether to file a charge.  I understand that by checking this box,
I have not filed a charge with the EEOC.  I also understand that I could lose my rights if I do not file a charge in time.

---

**BOX 2** ☑ I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above.
I understand that **the EEOC must give the employer, union, or employment agency that I accuse of discrimination**
information about the charge, including my name.  I also understand that the EEOC can only accept charges of job
discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing
discrimination.

---

_____                    _9-20-2016_
**Signature**                                **Today's Date**

**PRIVACY ACT STATEMENT:** This form is covered by the Privacy Act of 1974: Public Law 93-579. Authority for requesting personal data and the uses thereof are:
1) FORM NUMBER/TITLE/DATE. EEOC Intake Questionnaire (9/20/08). 2) AUTHORITY.  42 U.S.C. § 2000e-5(b), 29 U.S.C. § 211, 29 U.S.C. § 626. 42 U.S.C. 12117(a)
3) PRINCIPAL PURPOSE. The purpose of this questionnaire is to solicit information about claims of employment discrimination, determine whether the EEOC has jurisdiction over those claims, and provide charge filing counseling, as appropriate. Consistent with 29 CFR 1601.12(b) and 29 CFR 1626.8(c), this questionnaire may serve as a charge if it meets the elements of a charge. 4) ROUTINE USES. EEOC may disclose information from this form to other state, local and federal agencies as appropriate or necessary to carry out the Commission's functions, or if EEOC becomes aware of a civil or criminal law violation. EEOC may also disclose information to respondents in litigation, to congressional offices in response to inquiries from parties to the charge, to disciplinary committees investigating complaints against attorneys representing the parties to the charge, or to federal agencies inquiring about hiring or security clearance matters.
5) WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION. Providing this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge. It is not mandatory that this form be used to provide the requested information.

To whom it may concern,

Upon returning to work after maternity leave on May 7th, 2015, I went to my new boss, Justin Hafer. My boss of 14 ½ years, Dave Boggan, had been let go while I was on leave, and Justin seemed to be excited that I was back and willing to allow me to work as I always had because of my positive reputation for driving sales.  I told him that my excitement level was still there and I was ready to get the job done, but there were a few things that he needed to know about me that were sensitive and had only been shared with a select few in the past. Ken, the president that had resigned 3 years prior, Dave, my boss that they just let go, and Tim, the divisional analyst, that they just let go, as far as I knew.

    I showed him attachment "A" and explained that 6 years ago I had a 40 to 50 lb metal beam fall on my head while setting a remodel and this was my 2nd concussion while working for the company.  I also explained that since this accident, I had been having some problems but had worked very hard to figure out how to overcome them and still do my job successfully.  I explained that there were some things that I could not do in order to not cause brain fatigue and distress which caused migraine headaches and anxiety attacks. I also explained my dyscalculia and how I could not do spreadsheets so I had always contacted Tim in the past and he would do the spreadsheet and send it back to me.  Then I would send it out in order to come to a desired comparison or trend.  I also explained my word finding issues when under stress or lack of sleep. I explained my migraine treatments of 32 injections in my head and neck every 2 months and medication so that I could continue working.  I told him that, as he could see from the paperwork, anything with a squiggly line on the back page, which is mostly number or processing related, I scored so low that it is considered impaired.  I then explained that it takes me longer to learn new things like new computer programs or new ways of doing things.  I wanted him to know that it was not that I did not want to do things his way, it would just take me a bit longer to make any changes and he would have to be patient with me as I worked through the changes.  Justin looked over the paperwork and handed it back to me and said, "We can work with this."

    I went back to work and it started off fine.  I was pumping up stores and working on pumping up the sales teams and getting them motivated to grow, but slowly, he started asking me for more and more numbers that could not be pulled from a self calculating report, or asking me how we rank in different categories off of reports that were not ranked that way on large conference calls.

    After he sent me an e-mail on September 3rd, 2015, where he was quite upset because I did not send out information that he had requested, I contacted our home office AR department and let them know that I was feeling as if my job was in jeopardy because of my disability.  See attachment, "B". Melissa, the administrative assistant assigned to do formulas for me, had not had a chance to add in the additional information yet, and I was frightened for my job.

    When I contacted the home office AR department, they requested a copy of what paperwork I had shown to Justin so I faxed it to them and they requested that I get with my Dr and receive a new workplace accommodation sheet because that was so old.  I called Dr. Booksh and scheduled an appointment.

    I saw Dr. Booksh and she wrote up the accommodations off of the job description that our local AR representative gave me to give her, and a representative from home office, Ayesha Adams, came to Slidell from Atlanta to go over them with Justin and myself.  See attachment "C"

    At this point, he said he would have Melissa do all of my spreadsheets for me and I would just send them out and that we would just have to watch my mileage and plan my trips so that my trips would not break the company mileage policy.  We also discussed, in the meeting, that I would be traveling more, in the upcoming months, while training sales classes.  I thanked him for the spreadsheets and explained that when I mess up on something like that, it leaves me flustered for hours.

    After our meeting with AR, Justin decided that I could only be in my home store 1 day a week, giving me very little time for brain rest.

    Even though Melissa was doing the formulas and I was just cutting and pasting them, he would

still regularly send me things like this, see attachment, "E", that I would have to quickly have to get in touch with Melissa and find out what was going on and put myself into an anxiety attack.

By 3rd quarter, I was driving an average of 600miles a week and on my computer until at least 9:00 every night because I had to gather information from all bottom 20 stores and some did not turn it in until the end of their day, and Justin made it clear that if he called at 9:00AM, I needed to have the list of who was complete. That meant I had to drive to my next store, sometimes 100 to 250 miles the next morning, leaving little time for brain rest, so my headaches began to worsen and so did my anxiety level. My neurologist increased one medication and added another in an attempt to keep me in balance.

Then, at the beginning of December I was called into the office with Justin and Danielle, our local AR rep. Because of the fact that most people that go into the office with both of them do not come out with a job, it is known that you agree with whatever they ask of you when you are in there, or you are out of a job. Justin requested that I put a spreadsheet at the bottom of my daily "Marketing Today" e-mail instead of just the self populating list of stores that was on the bottom 20 that I had always insert. Every morning, he needed me to update their NCD (New Customer Deliveries). I knew with Danielle sitting there, I could do nothing but say, "OK". I had to get to work early so I could double and triple check the numbers. I found that even on my days off while I was taking a "Personal Day" I was expected to update the spreadsheet. See attachment "F"

Most Days, I was the first person, Regional Manager or Divisional Staff to get to my store so that I would have time to get all of this work done for him and still train my staff.

Then, on March 22nd, 2016, I sent out Justin's last spreadsheet. I had an appointment with my neurologist and asked him what he could do. I told him my schedule and let him know that I was eating Excedrin migraine and chasing it with Mountain Dew Voltage to keep my headaches down, but the car lights were still cutting through like daggers and he said, "No more." "You have put up a good fight and you are done."

He put me on disability for brain rest. See attachment, "G"

A

2 g 1 of A

## Neuropsychological and Psychological Services
## for Children and Adults, LLC

*Susan R. Andrews, Ph.D.*      *Melissa J. Aubert, Ph.D.*      *Randee L. Booksh, Ph.D.*

## NEUROPSYCHOLOGICAL EVALUATION

**NAME:**                      Harmony Peddy
**AGE:**                       35 years
**DATE OF BIRTH:**             2-15-1975
**DATES OF EVALUATION:**       11-1-2010, 11-2-2010
**DATE OF FEEDBACK**           12-7-2010
**DATE OF REPORT:**            12-14-2010
**REFERRAL:**                  Patrick Glynn, M.D.
**TESTS ADMINISTERED:**        Wechsler Adult Intelligence Scale-IV
                               A-Test of Auditory Inattention
                               Test of Variables of Attention
                               Sensory-Perceptual Screening Exam
                               Hooper Visual Organization Test
                               Wepman Memory for Spatial Orientation Test
                               Clock Drawing
                               Tactual Performance Test
                               Speech Sounds Perception Test
                               Seashore Rhythm Test
                               Finger Tapping Test
                               Grooved Pegboard Test
                               Boston Naming Test
                               Wide Range Achievement Test-4
                               Wechsler Memory Scale - IV
                               Category Fluency (Animals)
                               Letter FluencyTest (FAS)
                               Trail Making Test
                               Stroop Color and Word Test
                               Delis-Kaplan Executive Function System-
                                   20 Questions Test
                               Category Test
                               Hayling Test
                               Green's Word Memory Test
                               21 Item Test
                               Personality Assessment Inventory
                               Iowa Interview for Partial Seizure-Like Symptoms
                               Clinical Interview

2626 N. Arnoult Rd. • Ste.220 • Metairie, LA 70002  ψ  1217 Florida Street • Mandeville, LA 70448
Main.504.831.0109  ψ  andrews.office@att.net  ψ  Fax.504.834.8802

Jun. 7. 2016  9:26AM   Dr. Susan Andrews        RECEIVED  06/07/2016 09:09   9856413340        LAURIE MASCHEK        No. 9048   P. 13

Peddy, Harmony                                        2

**REFERRAL QUESTION AND RELEVANT HISTORY:**        Harmony Peddy is a 35-year-old married woman who sustained a closed head injury during a work related accident on 6-5-2009. She was referred for neuropsychological assessment by neurologist Dr. Patrick Glynn to assess her current level of functioning and assist in treatment planning.

During the clinical interview, Mrs. Peddy stated the injury occurred while she was working in a warehouse. She stated a construction crew had left metal beams on top of a refrigerator. Mrs. Peddy reported she was bent over looking for zip-ties when she bumped into the refrigerator and a beam, weighing 40 to 50 pounds, fell from the top of the refrigerator and struck her head. She stated she was hit on the top of her head, towards the right side, towards the back. Mrs. Peddy described having an alteration in consciousness, with foggy memory for events following the accident. She stated she does not remember the hit to the head, but recalled her hands being covered with blood after she touched her head. Mrs. Peddy reported she walked about 50 feet to the door, and hollered for help. A co-worker came to help her. He reportedly carried her to a nearby sofa, and then called for emergency services. Mrs. Peddy stated she was taken by ambulance to a hospital. She could not recall the name of the hospital. Mrs. Peddy said she was evaluated at the hospital and her scalp wounds were stapled closed. She reported a coworker drove her back to the warehouse. She reported she stayed at the warehouse for a few hours, and then drove herself home, but stated she doesn't really remember the drive home.

Mrs. Peddy stated after the accident she took several days off of work, as she had previously arranged to go on vacation to Pickwick Lake with her family. She experienced severe headaches, with dizziness and nausea, while on vacation. Upon arriving home, she went to an Urgent Care clinic. She was referred to Dr. Glynn, who prescribed Topamax for headaches. Mrs. Peddy stated she continued to experience breakthrough headaches in the afternoon, and in the middle of the night, while on Topamax. Dr. Glynn prescribed Flexeril, which helped with the breakthrough headaches. Mrs. Peddy stated she experienced episodes of confusion and "blackouts" following her head injury. She reported on one occasion she found herself in a store parking lot holding unfamiliar keys and a dustpan, and did not know what had happened. She stated she had "lost about 40 minutes". She also reported leaving her house "with the front door wide open" and getting lost while driving to familiar locations.

**CURRENT COMPLAINTS:**        Current complaints include: 1) headaches, 2-3 times a week, usually in the afternoon 2) irritability, 3) concentration problems, 4) memory disturbance, 5) weight loss, 6) vision disturbance, and 7) problems with organization.

Mrs. Peddy stated she feels she is not as "sharp" as she was prior to her head injury. She stated she has difficulty on the job with tasks that require short-term memory and data entry. She reported that now she has to look up information she had previously remembered easily, and that she has to double-check her work. She stated she has difficulty entering store numbers into the computer, and will mix up the numbers. She stated reading out loud is more difficult and that some words just don't seem to make sense to her. Mrs. Peddy stated she lost about 25 pounds after her head injury, which she believes may have been due partly to the medication Topamax. She initially had problems with sleep disturbance following her injury, but these problems have resolved. She experiences blurry vision and dizziness after taking off her

Peddy, Harmony                                              3

*Pg 3 of A*

sunglasses. Mrs. Peddy stated she is "a lot more snappy" with others, and feels she used to have a happier disposition. Mrs. Peddy reported she is starting to experience some anxiety and depression and is worried that her symptoms have continued for so long.

**MEDICAL HISTORY:**    Medical history prior to the accident on 6-5-2009 includes asthma during childhood, allergies, cholecystectomy, and a prior concussion. Mrs. Peddy stated she sustained the prior concussion about 2 years ago at work, when a plastic pineapple fell on her head. She stated, "it was nothing- they made me go to the hospital to check it out". She reported the decorative pineapple weighed about two pounds and left a small cut on the top of her head. She did not experience alteration in consciousness and denied any residual cognitive complaints related to the concussion she sustained two years ago. She denied posttraumatic headaches following this injury.

Mrs. Peddy reported following a cholecystectomy in 1999, a gallstone was lodged in her bile duct. She stated she was found on the floor unconscious by a friend. Mrs. Peddy stated she experienced multiple organ failure and was hospitalized for two weeks. She has no memory of her hospitalization. Mrs. Peddy denied any residual cognitive problems associated with this event, and pointed out that she was hired by Aaron's following this event.

Family history is positive for seizures. Mrs. Peddy's 6-year-old son has epilepsy. Mrs. Peddy stated she believes her paternal grandfather may have had a seizure disorder, because he took the medication Dilantin.

Prior psychiatric contact includes a 30-day hospitalization to treat bulimia at age 14 years old. Mrs. Peddy stated the treatment was very helpful and her problems with bulimia were resolved. Mrs. Peddy denied past or present problems with alcohol or substance abuse. Current medications include Excedrin, Topamax and Flexeril.

**MEDICAL RECORD REVIEW:**    Limited medical records were received from Dr. Patrick Glynn. A report dated 8-31-2010 indicated Mrs. Peddy was being followed for Post-concussive syndrome. Problems with continued headaches, difficulty with concentration, and worsening anxiety and stress were noted. Dr. Glynn prescribed Topamax, 25 mg in the morning, 25 mg in the afternoon, and 50 mg at night, and instructed Mrs. Peddy to continue cyclobenzaprine and Excedrin migraine, as needed. Dr. Glynn noted that during the Rhomberg examination, Mrs. Peddy immediately fell forward when her eyes were closed. Dr. Glynn recommended neuropsychological assessment due to her concentration problems and memory complaints.

**SOCIAL HISTORY:**    Mrs. Peddy is one of three children. She was born in Emporia, KS. No problems were reported with her gestation, delivery, or early development. Her parents divorced during her childhood. She reported splitting her time between Chicago, IL and Kansas. Mrs. Peddy's father died from liver cancer at age 54 years.

Educational history: Mrs. Peddy stated she was diagnosed as gifted in early elementary school. She reported doing best in English courses. Mrs. Peddy graduated from Fredonia High School with a 3.9 grade point average. She has never been diagnosed with a learning disorder or Attention-Deficit/Hyperactivity Disorder. Mrs.

Peddy, Harmony                                         4

Peddy was a cheerleader in college. She reported completing some coursework at the University of Wisconsin, and obtained an Associates Degree in Audio Engineering from Madison Media Institute.

Employment history includes a position as a Divisional Sales Manager for Aaron's, Inc. since 8-22-2000. Previous employment includes mainly bartending and/or waitressing positions for Outer Limits (1999-2000), Club La Vela (1998-1999), and Applebees Restaurant (1994-1999).

Mrs. Peddy has been married to her first and only husband for 7.5 years. They have one son, age 6-years. The family resides in Picayune, MS. Mrs. Peddy reported she spends most of her time with her family. Leisure activities include walking, attending sporting events, and playing with her son. Mrs. Peddy is able to drive and completes activities of daily living independently.

**BEHAVIORAL OBSERVATIONS:**   Mrs. Peddy arrived on time for the scheduled appointments. She was neatly groomed and dressed and appeared younger than her stated age. Her attitude was cooperative and unguarded and she put forth a full effort. A good rapport was established. Mood and affect were anxious. Eye contact was good. Motor activity was within normal limits. Attention and concentration were variable. Repetition of complex instructions was required. Thought processes were logical and goal oriented. Mrs. Peddy was expressive and articulate during conversation, though mild word-finding problems and reduced fluency were noted. Comprehension appeared to be average during the evaluation. Insight and judgment were average.

**MOTIVATION/VALIDITY OF RESULTS:**   Tests of the level of effort a person gives were employed to provide a measure of Mrs. Peddy's motivation to perform on tests in which the outcome may result in compensation. Mrs. Peddy completed three effort tests, including two visual memory tests and a verbal memory measure, which include effort indices. All of Mrs. Peddy's scores were in the acceptable range for adults giving a solid effort. Overall, the results of the evaluation are thought to be an accurate and valid representation of Mrs. Peddy's current level of functioning.

**RESULTS AND DISCUSSION:**   The battery of neuropsychological tests selected is shown at the beginning of this report. The resulting data from this evaluation is appended in a table at the end of the report, including a T-score or %ile rank, where it is available, in the designated column[1]. Scores that are in the Impaired range are marked with a, "§", in a column for ease of scanning. The T-scores are calculated using the Heaton et al Revised norms (1991, 1992, 2004)[2] and are corrected for sex (female), ethnicity (Caucasian), age (35 years), and education (14 years).

---

[1] T-scores of 0-19= severe impairment; 20-24=mod to severe impairment; 25-29= mod impairment; 30-34=mild to mod impairment; 35-39=mild impairment; 40-44=below average; 45-54= average; 55+=above average.  A T score of 40 is equivalent to a SS of 85, a percentile of 16, and a scaled score of 7. Standard scores (and the equivalent percentile ranks) from 80 to 89 (9th to 23rd %ile) are Average, 90 to 109 (25th to 73rd %iles) are Average, 110 to 119 (75th to 90th %iles) are Low Average and 120 to 99.9th %iles) and above are in the Superior range.
[2] Heaton, Robert K, Miller, S.Walden, Taylor, Michael J, and Grant, Igor. (1991, 1992, 2004)  Revised Comprehensive Norms for an Expanded Halstead-Reitan Battery: Demographically Adjusted Neuropsychological Norms for African American and Caucasian Adults, Psychological Assessment Resources, Inc.

Peddy, Harmony

5

Pg 5 of A

General intellectual ability, as measured by the Wechsler Adult Intelligence Scale-IV (WAIS-IV), is always included in a full neuropsychological evaluation and serves a number of purposes, including the prediction of past or premorbid abilities. The WAIS-IV also provides a means of observing many behaviors in a standardized situation. Finally, many of the subtests provide information about brain function.

The WAIS-IV is composed of 10 core subtests, and 5 optional subtests, which measure cognitive abilities. The test framework of the WAIS-IV is organized into four index scales: Verbal Comprehension, Perceptual Reasoning, Working Memory, and Processing Speed. These index scores are composite, or average scores, for the subtests measuring the respective cognitive domains. Verbal Comprehension is a measure of past learning, the ability to express oneself verbally, and verbal reasoning and problem solving. Perceptual Reasoning generally measures adaptive behavior through tasks that rely on visual attention to detail, visual-spatial analysis, and visual-motor abilities. Working Memory is a measure of one's ability to hold and manipulate information in short-term memory. Processing Speed measures a subject's ability to complete paper and pencil tasks, which require visual scanning and coding skills. The Full Scale IQ is an average of the 10 core subtests, and reflects the subjects overall performance on the WAIS-IV. Each subtest has a mean of 10 and a standard deviation of 3 while the Index and IQ scores have a mean of 100 and standard deviation of 15.

Intellectually, Mrs. Peddy is currently functioning in the Low Average range of intelligence with a WAIS-IV Full Scale IQ of 84 (14th percentile). There is a 23-point difference between her Verbal Comprehension composite score, which is in the Average range at 107 (68th percentile) and her Perceptual Reasoning composite score, which is in the Low Average range at 84 (14th percentile). This difference is statistically significant (p. < .05) and indicates Mrs. Peddy's verbal problem solving skills are currently much higher than her non-verbal problems solving skills. Subtest scaled scores range from a low of 4 (Borderline range) on Symbol Search and Coding, to a high of 12 (High Average range) on Information. The Working Memory composite score was 80 (Low Average range) and the Processing Speed composite score was 68 (Extremely Low range). The General Ability index score is a composite score, which is less sensitive to the influence of Working Memory and Processing Speed. Mrs. Peddy's General Ability score was 96 (Average range). Mrs. Peddy showed a relative weakness on the Symbol Search and Coding subtests, and showed relative strengths on the Similarities, Vocabulary, and Information subtests. Her Full Scale IQ is lower than her estimated Full Scale IQ of 106 (+/- 18) based on the Wechsler Test of Adult Reading, and is lower than would be predicted based on her reported academic and employment history.

On formal measures of attention and concentration, Mrs. Peddy's performance was variable. She did not make any errors on a test of auditory vigilance. She made 4 errors on a letter cancellation task. All of her errors were on the right side of the page. She was able to recite 5 digits forward and 4 digits reversed. On the Trail Making Test (TMT), Mrs. Peddy completed part A in 39", which resulted in a score of 32T, which is in the Impaired range. She completed part B in 80", which resulted in a score of 37T, which indicates Impaired ability to alternate attention on this task. She did not make any sequencing errors or set-loss errors on part B the TMT.

Peddy, Harmony

6

On the Stroop, Mrs. Peddy scored in the Impaired range for Words (<15T), and Color (31T), and range for Color/Word (39T). Her Color Word score compared to her predicted Color Word score yielded a score in the Above Average range for Interference (57T). The Test of Variables of Attention was discontinued, as Mrs. Peddy complained of nausea during the measure. She began blinking excessively, and developed a headache, and complained of sensitivity to light following her brief exposure to this measure. She took Excedrin at this point and was given a brief break.

On measures of executive functioning, Mrs. Peddy showed variable performance. Her score on the Hayling, a measure of response initiation, response suppression ability, and thinking time, was in the Average range (SS = 6). On the 20 Questions test, a measure of verbal abstract reasoning and conceptual problem-solving, Mrs. Peddy scored in the Average range for Initial Abstraction (SS = 10), and Total Questions Asked (SS = 10). Her score for Weighted Achievement was in the High Average range (SS = 12). She scored in the Below Average range on the Category Test (40T), which measures higher level conceptual problem solving. This measure requires the ability to shift strategies on the basis of feedback and information, and the ability to generate, test, and monitor possible problem-solving hypotheses.

Language fluency tasks were administered, which provide a sample of letter and category fluency, and also provide an indicator of executive functioning. On the Letter Fluency Test, Mrs. Peddy scored in the Impaired range (33T). She was able to generate 27 words during the test. On the Category Fluency Test, Mrs. Peddy generated 15 animals in 60", which resulted in a score of 33T, which is in the Impaired range. She made multiple repetition errors and/or set/loss errors on these fluency tasks, and generally showed a significant reduction in fluency after about 15-20 seconds. On the Boston Naming Test, which measures confrontational naming, Mrs. Peddy correctly identified 43 out of 60 pictures of common objects and was able to name an additional 14 of 17 remaining objects when presented with a phonemic cue. This resulted in a score of 24T, which is in the Impaired range, based on her age and education. She became very frustrated with her inability to generate names during this measure.

On the Sensory-Perceptual measures, Mrs. Peddy's performance was generally Impaired. On the Seashore Rhythm Test (SRT) she scored in the Below Average range (41T). Her score on the Speech Sounds Perception Test (SSPT) was also in the Below Average range with a T of 44. The SRT and SSPT provide an indication of auditory perceptual functioning, as well as sustained auditory attention. The Tactile Performance Test (TPT) assesses speed of motor performance, tactile perception, spatial problem solving, and spatial memory. The TPT is a measure related to right and left parietal functioning and can provide an indication of lateralizing differences. Mrs. Peddy scored between the Impaired and Low Average ranges for time to place the blocks with either hand: Right = 37T, Left = 37T, Both = 43T. Her score for Total Time was Imparied (38T). She scored in the Impaired range for Memory of block shape (26T) and memory of block Location (26T). On the Wepman Memory for Spatial Orientation, Mrs. Peddy correctly identified 19 of 20 items, which is within the Average range. On the Hooper Test of Visual Organization, Mrs. Peddy correctly identified 22 of 30 objects, which is in the Below Average range (40T). On the Clock Drawing Test, Mrs. Peddy made one error, which she self-corrected, and showed some mild problems with spacing.

Peddy, Harmony                                    7

Pg 7 of A

Mrs. Peddy is right hand dominant. Motor speed for her dominant right hand is in the Average range (52T). Mrs. Peddy tapped an average of 48 taps per 10 seconds with her dominant hand. She tapped an average of 47.8 taps per 10 seconds with her nondominant left hand, which is in the Average range (53T). Although her scores were within Average limits, she failed to show the expected dominant hand advantage. Her visual-fine-motor coordination on the Grooved Pegboard Test was in the Impaired range for her right hand (39T), and in the Below Average range for her left hand (40T). This combination of scores of psychomotor tasks indicates lateralizing significance.

On measures of academic achievement, Mrs. Peddy generally scored at the high school level, with the exception of her score for arithmetic, which was at the 4.6 grade level. On the Wide Range Achievement Test-4, she obtained standard scores of 94 (34th percentile) on Word Reading and 104 (61st percentile) on Sentence Comprehension, which resulted in a score of 99 (47th percentile) on the Reading Composite. The Spelling score was 93 (32nd percentile) and the Math Computation score was 74 (4th percentile). Mrs. Peddy's score are generally consistent with her academic history, with the exception of her math score.

On the Wechsler Memory Scale-IV, Mrs. Peddy scored in the Average range on Auditory Memory (SS = 101; 53rd percentile). She scored within the Average range on Visual Memory with a standard score of 100 (50th percentile). Visual Working Memory was in the Low Average range at 80 (9th percentile). Immediate Memory was in the Average range at 94 (34th percentile). Her Delayed Memory was in the Average range at 107 (68th percentile). Mrs. Peddy's memory index scores were generally commensurate with what would be predicted based on her General Ability index score, with the exception of her score for Visual Working Memory, which was significantly lower than would be predicted.

On the Personality Assessment Inventory, scores on the Validity scales were within Average limits for Inconsistency, Infrequency, Negative Impression Management, and Positive Impression Management. This indicates she responded to the items in an appropriate and consistent manner, without any apparent attempts to portray a biased report of her personality and emotional functioning. Scores for all Clinical scales are reported on the data summary sheet. There were significant elevations for the following Clinical subscales. Somaticism: Conversion Symptoms = 75T, and Somatization = 73. This profile indicates Mrs. Peddy reported many neurological problems and is very focused on her physical symptoms.

**IMPRESSIONS:**

| | | |
|---|---|---|
| I | 294.9 | Cognitive Disorder, NOS (Postconcussive Syndrome) |
| | 300.00 | Anxiety Disorder, NOS |
| II | | No Diagnosis |
| III | | History of closed head injury with alteration in consciousness |
| V | GAF = 70 | Current |

Peddy, Harmony

8



**SUMMARY:**    Mrs. Peddy is a 35-year-old woman who sustained a closed head injury with alteration in consciousness on 6-5-2009 when she was struck on the head by a metal construction beam, which reportedly weighed 40 to 50 pounds, that had fallen off of the top of a refrigerator. Mrs. Peddy stated MRI of the brain and EEG studies were interpreted as negative. She has experienced migraine headaches, problems with concentration, memory, and organization, and irritability since her head injury. She is currently being treated by Dr. Glynn for Postconcussion syndrome. Mrs. Peddy is taking Topamax, Flexeril, and Excedrin Migraine for headaches.

On formal testing, Mrs. Peddy is currently functioning in the Low Average range of intelligence, with a Full Scale IQ of 84. Her current Full Scale IQ is lower than would be expected, based on her estimated premorbid IQ of 106 on the WTAR and her General Ability Index of 96. Additionally, Mrs. Peddy reported being diagnosed as intellectually gifted during childhood and graduated from high school with a 3.9 grade point average.  Mrs. Peddy showed deficits, or scored lower than would be expected, on the following measures:

<u>General Intellectual Functioning</u>
- Perceptual Reasoning was in the Low Average range.
- Working Memory was at the bottom end of the Low Average range.
- Processing Speed was in the Extremely Low range.
- Estimated Full Scale IQ of 84 likely represents a significant decline from her premorbid level of functioning, as her estimated FSIQ was106 based on the Wechsler Test of Adult Reading, and her General Ability index score was 96.

<u>Attention/Concentration and Executive Functioning</u>
- Performance on the Trail Making Test was in the Impaired range for Part A, and Part B.
- Performance on the Stroop was Impaired for Color, Word, and Color/Word.
- The Test of Variables of Attention was discontinued due to excessive blinking, nausea, and headache, which appeared to be caused by exposure to this measure. This measure is administered on computer, and presents a rapidly appearing light stimulus, which can trigger seizure in those with seizure disorder.
- Performance on the Category Test was in the Below Average range.

<u>Perceptual Functioning</u>
- Below Average performance on the Speech Sounds Perception Test
- Below Average performance on the Seashore Rhythm Test.
- Below Average performance on the Hooper Test of Visual Organization
- Impaired performance on the Tactual Performance Test for time to complete the measure with the right hand alone, and left hand alone, and Impaired performance for Memory of block shape, and Location of block shape.

<u>Psychomotor Speed and Coordination</u>
- Lateralizing significance on the Finger Tapping Test, with failure to show the expected dominant right hand advantage.
- Impaired performance with the right hand and Below Average performance with the left hand on the Grooved Pegboard Test.

Peddy, Harmony

9

Pg 9 of A

## Language Functioning
- Impaired performance on the Letter Fluency Test.
- Impaired performance on the Category Fluency Test.
- Impaired performance on the Boston Naming Test.

Mrs. Peddy is showing cognitive deficits on testing, including significant problems with attention/concentration and executive functioning, impaired perceptual functioning, language impairment, and impaired fine motor dexterity with her right hand. There is an apparent reduction in Perceptual Reasoning and Working Memory on the WAIS-IV, and Processing Speed is in the Extremely Low range. By contrast, general memory appears to be intact, with all composite scores on the WMS-IV within normal limits, except Visual Working Memory, which is at the bottom end of the Low Average range. While many of her deficits indicate apparent left frontal lobe dysfunction (impaired right hand coordination, impaired verbal fluency, and significant word-finding problems), other deficits are suggestive of right hemisphere dysfunction (Perceptual Reasoning is significantly 23-points lower than Verbal Comprehension). She also shows some more diffuse symptoms, such as generalized slowing of processing speed.

Mrs. Peddy is experiencing severe migraine headaches, and experienced a headache during testing. During the feedback session, she reported new onset of a different type of headache, during which she experienced severe right-sided head pain only. Additionally, Mrs. Peddy reported episodes of "losing time" or suddenly becoming aware that she has missed large segments of time and has no memory of her actions. Her responses on the Iowa Interview for Partial Seizure-Like Symptoms indicated she is experiencing sensory symptoms, cognitive symptoms, and affective symptoms commonly associated with partial seizure activity. There is no report of automatisms or observed motor symptoms. There is family history of seizures, and her son was diagnosed with epilepsy. Mrs. Peddy began taking Topamax for her migraines, about one week after her work injury, which has been reported to cause problems in some patients, including psychomotor slowing, word-finding problems, and short-memory loss.

Mrs. Peddy's medical history includes a previous concussion, and multisystem failure following cholecystectomy, when a gallstone got stuck in her bile duct. She was found unconscious by a friend and has no memory of her hospital course following the multisystem failure. Mrs. Peddy denied any problems with cognitive functioning after the two aforementioned events, and noted she was hired by Aaron's after these events, did well at work, and was eventually promoted to divisional sales manager.

From a neuropsychological perspective, the results of testing are difficult to interpret, as there are multiple potential sources for Mrs. Peddy's cognitive impairment, including: previous medical history, damage from the blow to the head on 6-5-2009 (postconcussion syndrome and resultant migraine headaches), possible partial seizure symptoms-which may also be related to the 6-5-2009 injury, and medication side effects from Topamax. Mrs. Peddy was able to return to work, but reports difficulty on the job due to impaired short-term memory, and problems with organization, planning, and executive functioning. There is likely significant variability in her cognitive functioning, depending on her stress level, the status of her migraines, and her Topamax schedule. She experienced a migraine during testing, which likely adversely affected her scores on some measures. The results of testing show significant cognitive deficits for Mrs. Peddy

Peddy, Harmony                                    10

at this time, though they do not necessarily indicate permanent impairment. She may
show improvement over time, especially if her migraines lessen, or are successfully
treated.

*Pg 10 of A*

## RECOMMENDATIONS:

1. Continued treatment with Dr. Glynn for medical monitoring/management of Mrs.
   Peddy's neurological symptoms is recommended. Mrs. Peddy shows diffuse and
   focal deficits on neuropsychological testing and is reporting multiple seizure-like
   symptoms. At Dr. Glynn's discretion, repeat studies-including MRI and EEG-may
   be helpful in determining the etiology of her symptoms. Additionally, Mrs. Peddy
   should consult with Dr. Glynn regarding the best Topamax schedule, or possible
   medication alternatives, to minimize cognitive side effects.

2. Brief cognitive rehabilitation may help Mrs. Peddy to learn adaptive strategies to
   compensate for her cognitive deficits.

3. Therapy is recommended to address Mrs. Peddy's anxious symptoms and to
   improve her overall adjustment. Cognitive-behavioral strategies, progressive
   muscle relaxation, breathing techniques, and other relaxation strategies may
   assist with anxiety symptoms.

4. Repeat neuropsychological assessment in one year (or sooner if there is
   observed decline) is recommended to monitor and address any changes in Mrs.
   Peddy's functioning.


Thank you for referring Mrs. Peddy for evaluation.


Randee L. Booksh, Ph.D.
Clinical Neuropsychologist
Louisiana License Number 1074

RECEIVED 06/07/2016 09:09 9856413340 LAURIE MASCHEK
Jun. 7. 2016 9:27AM Dr. Susan Andrews No. 9048 P. 22

Peddy, Harmony
11

## Neuropsychological Evaluation Data Sheet

Pg 11 of A

### Personal ID Data.

| Name: | Harmony Peddy | Dates of Evaluation: | 11-1-2010, 11-2-2010 |
|---|---|---|---|
| DOB/Age: | 2-15-1975; 35 years | Educational Level: | 14 years |
| Sex: | Female | Handedness | Right |

| Measure | Obtained Score | Cutoff Score | § (if not WNL) |
|---|---|---|---|
| TOMM 1 | 48 | >25 | |
| TOMM 2 | 50 | >/=45 | |
| 21 Item Test Forced Choice | 12 | >8 | |
| 21 Item Inconsistency | 0 | <5 | |
| 21 Item Greatest Con. Miss. | 2 | <7 | |
| WMT Immediate Recall | 97.5 | > 82.5% | |
| WMT Delayed Recall | 95 | > 82.5% | |
| WMT Consistency | 92.5 | > 82.5% | |
| Reliable Digit Span | 8 | >/= 7 | |

### General Intellectual Ability.

| WAIS-IV | SS | %ile | Verbal Tests | SS | Perform Test | SS |
|---|---|---|---|---|---|---|
| Verbal Comprehension | 107 | 68 | Similarities | 11 | Block Design | 9 |
| Perceptual Reasoning | 84 | 14 | Vocabulary | 11 | Matrix Reasoning | 8 |
| Working Memory | 80 | 9 | Information | 12 | Visual Puzzles | 5 |
| Processing Speed | 68 | 2 | Digit Span | 6 | Symbol Search | 4 |
| Full Scale IQ | 84 | 14 | Arithmetic | 7 | Coding | 4 |
| General Ability | 96 | 39 | WTAR estimated FSIQ = 106 (+/- 18) | | | |

### Attention, Concentration, and Executive Functioning.

| Measure | Obtained Score | T-score | Normal Range | § (if not WNL) |
|---|---|---|---|---|
| A-Test | 0 | NA | 0 ers | |
| Letter Cancellation | 4 | NA | None or few errors | |
| Digit Span-F | 5 | NA | 7 +/- 2 | |
| Digit Span-R | 4 | NA | Forward DS-1 | |
| Trail Making Part A | 39 | 32 | 40-55+ T | § |
| Trail Making Part B | 80 | 37 | 40-55+ T | § |
| Stroop Word | 48 | <15 | 40-55+ T | § |
| Stroop Color | 55 | 31 | 40-55+ T | § |
| Stroop Color/Word | 32 | 39 | 40-55+ T | § |
| Interference | 7 | 57 | 40-55+ T | |
| Category Test | 54 | 40 | 40-55+ T | -- |
| T.O.V.A. | Obtained Score | Standard Score | | |
| Variability | Discontinued | Discontinued | 85-115 SS | Discontinued |
| Response Time | Discontinued | Discontinued | 85-115 SS | Discontinued |
| Commission Errors | Discontinued | Discontinued | 85-115 SS | Discontinued |
| Omission Errors | Discontinued | Discontinued | 85-115 SS | Discontinued |
| 20 Questions Test | Obtained Score | Scaled Score | | |
| Initial Abstraction | 31 | 10 | >/=7-8 | |
| Total Questions Asked | 28 | 10 | >/=7-8 | |
| Weighted Achievement | 16 | 12 | >/=7-8 | |
| Hayling Test | 18 | 6 | 5 to 10 | |

### Perceptual Functions.

| Measure | Raw Score | T-Score | Normal Range | § (if not WNL) |
|---|---|---|---|---|

RECEIVED  06/07/2016 09:09    9856413340    LAURIE MASCHEK
Jun. 7. 2016  9:28AM   Dr. Susan Andrews                    No. 9048   P. 23

Peddy, Harmony                                12

Pg 12 of A

| Seashore Rhythm Test | 26 | 41 | 40-55+ T | -- |
|---|---|---|---|---|
| Speech Sounds | 5 | 44 | 40-55+ T | -- |
| Hooper | 22 | 40 | 25 to 30 | -- |
| Wepman | 19 | NA | 15 to 20 | |
| TPT Dominant | .79 | 37 | 40-55+ T | § |
| TPT Non-Dominant | .68 | 37 | 40-55+ T | § |
| TPT Both | .30 | 43 | 40-55+ T | -- |
| TPT Total | .590 | 38 | 40-55+ T | § |
| TPT Memory | 4 | 26 | 40-55+ T | § |
| TPT Location | 0 | 26 | 40-55+ T | § |

### Motor Functions

| Measure | Raw Score | T-Score | Normal Range | § (if not WNL) |
|---|---|---|---|---|
| Finger Tap Dominant | 48 | 52 | 40-55+ T | Lateralizing significance |
| Finger Tap Non-Dom. | 47.8 | 53 | 40-55+ T | |
| Grooved Peg Dominant | 68 | 39 | 40-55+ T | § |
| Grooved Peg Non-D | 74 | 40 | 40-55+ T | -- |

### Language Functions/Academic Achievement

| Measure | Raw Score | T- score | Normal Range | § (if not WNL) |
|---|---|---|---|---|
| Letter Fluency FAS | 27 | 33 | 40-55+ T | § |
| Category Fluency -Animals | 15 | 33 | 40-55+ T | § |
| Boston Naming Test | 43 | 24 | 40-55+ T | § |
| WRAT-4 | Standard Score | Percentile | | Grade Level |
| Word Reading | 94 | 34 | 9th-74th+ % | 11.9 |
| Sentence Comprehension | 104 | 61 | 9th-74th+ % | >12.9 |
| Spelling | 93 | 32 | 9th-74th+ % | 11.5 |
| Math Computation | 74 | 4 | 9th-74th+ % | 4.6 |
| Reading Composite | 99 | 47 | 9th-74th+ % | |

### Memory and New Learning

| Measure | Standard Score | Percentile | Normal Range | § (if not WNL) |
|---|---|---|---|---|
| WMS-IV Indices | | | | |
| Auditory Memory | 100 | 53 | 9th-74th+ % | |
| Visual Memory | 100 | 50 | 9th-74th+ % | |
| Visual Working Memory | 80 | 9 | 9th-74th+ % | -- |
| Immediate Memory | 94 | 34 | 9th-74th+ % | |
| Delayed Memory | 107 | 68 | 9th-74th+ % | |

### Personality/Emotional

| PAI scales | T-Score | Scale | T-Score | Scale | T-Score |
|---|---|---|---|---|---|
| INC | 46 | MANIA | 55 | SUICIDE | 43 |
| INF | 59 | PARANOIA | 48 | STRESS | 44 |
| NIM | 47 | SCHIZOPREN. | 45 | NON SUPP. | 39 |
| PIM | 59 | BORDERLINE | 43 | RES TO TX. | 59 |
| SOMATICISM | 69 | ANTISOCIAL | 40 | DOMINANCE | 58 |
| ANXIETY | 52 | AGGRESSION | 40 | WARMTH | 65 |
| ANX. REL DIS | 51 | ALCOHOL | 41 | | |
| DEPRESSION | 49 | DRUGS | 42 | | |

**Subject:** FW: WTD MESSAGE

**From:** Peddy, Harmony (Harmony.Peddy@aarons.com)

**To:** blpeddy@yahoo.com;

**Date:** Friday, September 4, 2015 8:23 AM

Harmony V. Peddy
Mississippi Valley Divisional Sales Manager
185 Gause Blvd, W
Slidell, LA 70460
Office-985-781-0214
Fax-855-411-5774
Cell-615-415-4271

RTR

"People may not remember exactly what you did, or what you said, but they will always remember how you made them feel."

**From:** Peddy, Harmony
**Sent:** Thursday, September 03, 2015 6:27 AM
**To:** Hafer, Justin
**Subject:** RE: WTD MESSAGE

Pretty quick to do without 2 concussions.

Those types of things are what I have BIG trouble with.

That is why I brought in my paperwork for you to see.

On all of the # related issued I scored below the # rating scales and in the "impaired" category.

Even just looking at the store #s and not getting 338 and 388 confused is difficult for me since the last concussion.

I have to have someone create a formula in the system so I can just put in the #s and it comes out or I mess it up.

I do not mean to delay; I just have to go through steps to make sure it is done correctly.

Before the last accident, I was very good at #s.

I have had to learn to adjust.

Before I went through 3 years of therapy, I would send out spreadsheets that were all messed up, now, I have learned to slow down...

Make sure the formula is correct...

Have someone else proof it for me...

Then send it out.

Better to get it correct than to send out incorrect or backward information.

Harmony V. Peddy
Mississippi Valley Divisional Sales Manager
185 Gause Blvd. W
Slidell, LA 70460
Office-985-781-0214
Fax-855-411-5774
Cell-615-415-4271

RTR

**"People may not remember exactly what you did, or what you said, but they will always remember how you made them feel."**

Pretty quick to do.

If today is Thursday. You would divide by 3 working days.

Take NCD WTD. Divide by number of store in region. Then divide working days

All it rquires is a calculator.

**From:** Hafer, Justin
**Sent:** Thursday, September 03, 2015 6:09 AM
**To:** Peddy, Harmony
**Subject:** RE: WTD MESSAGE

Sent from my Sprint Samsung Galaxy® Note 4.

-------- Original message --------
From: "Peddy, Harmony" <Harmony.Peddy@aarons.com>
Date: 9/3/2015 5:36 AM (GMT-05:00)
To: "Hafer, Justin" <Justin.Hafer@aarons.com>
Subject: Re: WTD MESSAGE

Sir, this requires a formula.
Even if I was not slammed with bed bugs, I would not be able to do it by myself.
I explained my limitations on reports and #s when you got here.

I showed Melissa the desired outcome and where the needed #s are needed.
She will add them into tomorrow's reports for me when
she figures out a formula that will calculate the # daily for me so it will self populate when the report comes out.
We will have it to you with your reports very soon.
I am sorry for the delay.
I wanted to get them out today as I stated in the voice mail or text or e-mail, even though the other part was not yet formulated.

Harmony V. Peddy
Mississippi Valley Divisional Sales Manager
Cell 615-415-4271
Office 985-781-0214

On Sep 2, 2015, at 9:42 PM, "Hafer, Justin" <Justin.Hafer@aarons.com> wrote:

You did not include NCD Average WTD.  Can you do just like the text I sent you?
I want to be able to show them why are they are down with NCD averages.

*Justin Hafer*
Divisional Vice President
Mississippi Valley Operations
justin.hafer@aarons.com
Aaron's Inc
FAX# 855-441-5774

From: Peddy, Harmony
Sent: Wednesday, September 02, 2015 2:56 PM
To: Jones, Michael D.
Cc: Hafer, Justin
Subject: WTD MESSAGE

-8 CUSTOMERS                    -2,038 GAP

C

Pg 1 of C

## Neuropsychological and Psychological Services
## for Children and Adults, LLC

*Susan R. Andrews, Ph.D.    Melissa J. Aubert, Ph.D.    Randee L. Booksh, Ph.D.*

### Recommendation for Accommodations in the Workplace

**NAME:**                      Harmony Peddy
**AGE:**                       40 years
**DATE OF BIRTH:**             2-15-1975
**DATE OF LAST CONTACT:**      9-28-2015
**INITIAL REFERRAL:**          Patrick Glynn, M.D.

**REFERRAL QUESTION AND RELEVANT HISTORY:**     Harmony Peddy is a 40-year-old married woman who sustained a closed head injury during a work related accident on 6-5-2009. She was initially referred for neuropsychological assessment by neurologist Dr. Patrick Glynn and was evaluated by this practice in November 2010. Results from a neuropsychological evaluation completed in November 2010 indicated Cognitive Disorder (Postconcussive Syndrome), and Anxiety Disorder, NOS and severe migraine headaches secondary to the work related injuries sustained on 6-5-2009.

Mrs. Peddy participated in treatment with the current writer between July 2011 and November 2012 to address anxiety, residual cognitive complaints, migraine headaches, and to improve adaptive functioning at home and at work. She was motivated and responded well to treatment with a noted reduction in panic attacks and good ability to maintain her productivity at work. She has some mild residual cognitive deficits, including dyscalculia (difficulty with math calculations), and reduced processing speed, working memory, and executive functioning. She demonstrates impaired verbal fluency, and word-finding problems when stressed or very anxious. Anxiety can greatly exacerbate her deficits.

Generally, Mrs. Peddy has done very well at home and at work with use of some compensatory strategies. These include having a coworker deal with components of her job that require manipulating numbers, (i.e., using formulas, using Excel or similar programs, and/or working with number spreadsheets). It is important to note her conceptual knowledge and understanding of her work is not impaired. It is not that she does not understand the purpose or point of a formula. It is that, due to her cognitive disorder, she is very likely to transpose numbers, and it is very difficult for her to spot or correct this type of mistake. Similarly, she has not experienced a reduction in her general language skills, verbal reasoning, or in her ability to communicate with others, she is simply more likely to utter the wrong word, or have trouble thinking of the word she wants when under stress or when anxious. These errors are embarrassing and anxiety provoking, and cause her to become temporarily very flustered, which causes even more impairment.

2626 N. Arnoult Rd. • Ste.220 • Metairie, LA 70002 ψ 1217 Florida Street • Mandeville, LA 70448
Main.504.831.0109 ψ srandrews.office@gmail.com ψ Fax.504.834.8802

Peddy, Harmony                                    2

Additionally, Mrs. Peddy has found it is very important to minimize the unknown and decrease any unnecessary demands on attention and/or working memory while driving. This has reduced her general anxiety while driving, greatly decreased her panic attacks, and essentially allowed her to continue driving. She does this by using the same car routinely when driving, using a Garmin for navigation, and planning for any work or leisure trips in advance. Adding an unknown, such as a new or different vehicle, a new or different navigational device, or a sudden change in route or location, greatly increases her anxiety and the potential for a panic attack while driving. Additionally, she uses a number of cognitive-behavioral techniques to address anxiety on a regular basis.

These minor work and driving accommodations, compensatory and adaptive strategies were reviewed with Mrs. Peddy during a consultation on 9-28-2015. She reported she had been doing well at work by having a co-worker complete tasks requiring manipulating numbers, formulas, and/or numerical spreadsheets and had been able to use her own vehicle for business trips up until very recently, when there was a change in management and perhaps a misunderstanding about her mild residual cognitive problems and anxiety. She stated her company requested a formal letter listing her current limitations and recommended workplace accommodations for her diagnoses of Cognitive Disorder and Anxiety Disorder. These two accommodations should allow Mrs. Peddy to return to her usual level of functioning. She appears motivated to be productive and successful at the workplace.

Please contact me with any questions or concerns.

Randee L. Booksh, Ph.D.
Clinical Psychologist and Neuropsychologist
Louisiana License Number 1074

## RE: WTD MESSAGE

**Peddy, Harmony**

**Sent:** Friday, February 12, 2016 3:11 PM
**To:** Hafer, Justin
**Cc:** Knapp, Damon; Leibe, Melissa

Justin, Damon,

There are not 9 days in a week.
This is a Week to date message not month to date message.

Harmony V. Peddy
Mississippi Valley Divisional Sales Manager
Office 985-718-4358
Fax-855-411-5774
Cell-615-415-4271
"People may not remember exactly what you did, or what you said, but they
will always remember how you made them feel."

# RTR

**From:** Hafer, Justin
**Sent:** Friday, February 12, 2016 2:06 PM
**To:** Peddy, Harmony
**Subject:** Fwd: WTD MESSAGE

Harmony. These have to be right or it loses value when I address the RMs. Can you please double check
your work before you send out. I am sure there are others if his is wrong.


Sent from my Sprint Samsung Galaxy® Note 4.


-------- Original message --------
From: "Knapp, Damon" <Damon.Knapp@aarons.com>
Date: 2/12/2016 1:50 PM (GMT-06:00)
To: "Hafer, Justin" <Justin.Hafer@aarons.com>, "Peddy, Harmony" <Harmony.Peddy@aarons.com>
Subject: RE: WTD MESSAGE

Not sure where the 1.85 is coming from but my avg is 2.4. 194 NCDs/9 stores / 9 days.

Still not enough to overcome the payouts.

Pushing hard...

Thanks,
Damon H. Knapp
Senior Regional Manager
Aaron's, Inc.
*Four Rivers, Ms River, Ms Delta Regions*

Date: 2/11/2016 3:15 PM (GMT-06:00)
To: "Knapp, Damon" <Damon.Knapp@aarons.com>
Cc: "Hafer, Justin" <Justin.Hafer@aarons.com>
Subject: WTD MESSAGE

| Four | -44 | -5858 | 1.85 |

## RE: WTD MESSAGE

**Peddy, Harmony**
**Sent:** Friday, February 12, 2016 3:07 PM
**To:** Hafer, Justin

I will ask Melissa to check the formula again.
Sorry.

Harmony V. Peddy
Mississippi Valley Divisional Sales Manager
Office 985-718-4358
Fax-855-411-5774
Cell-615-415-4271
"People may not remember exactly what you did, or what you said, but they
will always remember how you made them feel."
# RTR

**From:** Hafer, Justin
**Sent:** Friday, February 12, 2016 2:06 PM
**To:** Peddy, Harmony
**Subject:** Fwd: WTD MESSAGE

Harmony. These have to be right or it loses value when I address the RMs. Can you please double check
your work before you send out. I am sure there are others if his is wrong.

Sent from my Sprint Samsung Galaxy® Note 4.

-------- Original message --------
**From:** "Knapp, Damon" <Damon.Knapp@aarons.com>
**Date:** 2/12/2016 1:50 PM (GMT-06:00)
**To:** "Hafer, Justin" <Justin.Hafer@aarons.com>, "Peddy, Harmony" <Harmony.Peddy@aarons.com>
**Subject:** RE: WTD MESSAGE

Not sure where the 1.85 is coming from but my avg is 2.4. 194 NCDs/9 stores / 9 days.

Still not enough to overcome the payouts.

Pushing hard...

Thanks,
Damon H. Knapp
Senior Regional Manager
Aaron's, Inc.
*Four Rivers, Ms River, Ms Delta Regions*
601-807-8083 (M)
855-461-2933 (F)

601-807-8083 (M)
855-461-2933 (F)

---

**From:** Hafer, Justin
**Sent:** Thursday, February 11, 2016 7:22 PM
**To:** Peddy, Harmony; Knapp, Damon
**Subject:** RE: WTD MESSAGE

2.5 has to be your bottom line
3.0 is where you have to work to
5 is possible. Just change the standard


Sent from my Sprint Samsung Galaxy® Note 4.


-------- Original message --------
From: "Peddy, Harmony" <Harmony.Peddy@aarons.com>
Date: 2/11/2016 3:15 PM (GMT-06:00)
To: "Knapp, Damon" <Damon.Knapp@aarons.com>
Cc: "Hafer, Justin" <Justin.Hafer@aarons.com>
Subject: WTD MESSAGE

| Four | -44 | -5858 | 1.85 |
|------|-----|-------|------|

## FW: WTD MESSAGE

**Peddy, Harmony**
Sent: Friday, February 12, 2016 3:09 PM
To:   Leibe, Melissa

Melissa,

See below from Justin and Damon.
Would you mind checking the formula to make sure it is dividing correctly, the amount of days?

Thanks!

Harmony V. Peddy
Mississippi Valley Divisional Sales Manager
Office 985-718-4358
Fax-855-411-5774
Cell-615-415-4271
"People may not remember exactly what you did, or what you said, but they
will always remember how you made them feel."
RTR

**From:** Hafer, Justin
**Sent:** Friday, February 12, 2016 2:06 PM
**To:** Peddy, Harmony
**Subject:** Fwd: WTD MESSAGE

Harmony. These have to be right or it loses value when I address the RMs. Can you please double check
your work before you send out. I am sure there are others if his is wrong.

Sent from my Sprint Samsung Galaxy® Note 4.

-------- Original message --------
From: "Knapp, Damon" <Damon.Knapp@aarons.com>
Date: 2/12/2016 1:50 PM (GMT-06:00)
To: "Hafer, Justin" <Justin.Hafer@aarons.com>, "Peddy, Harmony" <Harmony.Peddy@aarons.com>
Subject: RE: WTD MESSAGE

Not sure where the 1.85 is coming from but my avg is 2.4. 194 NCDs/9 stores / 9 days.

Still not enough to overcome the payouts.

Pushing hard...

Thanks,
Damon H. Knapp

# Fwd: WTD MESSAGE

**Hafer, Justin**
**Sent:** Friday, February 12, 2016 3:06 PM
**To:** Peddy, Harmony

Harmony. These have to be right or it loses value when I address the RMs. Can you please double check your work before you send out. I am sure there are others if his is wrong.

Sent from my Sprint Samsung Galaxy® Note 4.

-------- Original message --------
From: "Knapp, Damon" <Damon.Knapp@aarons.com>
Date: 2/12/2016 1:50 PM (GMT-06:00)
To: "Hafer, Justin" <Justin.Hafer@aarons.com>, "Peddy, Harmony" <Harmony.Peddy@aarons.com>
Subject: RE: WTD MESSAGE

Not sure where the 1.85 is coming from but my avg is 2.4. 194 NCDs/9 stores / 9 days.

Still not enough to overcome the payouts.

Pushing hard...

Thanks,
Damon H. Knapp
Senior Regional Manager
Aaron's, Inc.
*Four Rivers, Ms River, Ms Delta Regions*
601-807-8083 (M)
855-461-2933 (F)

---

**From:** Hafer, Justin
**Sent:** Thursday, February 11, 2016 7:22 PM
**To:** Peddy, Harmony; Knapp, Damon
**Subject:** RE: WTD MESSAGE

2.5 has to be your bottom line
3.0 is where you have to work to
5 is possible. Just change the standard

Sent from my Sprint Samsung Galaxy® Note 4.

-------- Original message --------
From: "Peddy, Harmony" <Harmony.Peddy@aarons.com>

**From:** Hafer, Justin
**Sent:** Thursday, February 11, 2016 7:22 PM
**To:** Peddy, Harmony; Knapp, Damon
**Subject:** RE: WTD MESSAGE

2.5 has to be your bottom line
3.0 is where you have to work to
5 is possible. Just change the standard


Sent from my Sprint Samsung Galaxy® Note 4.


-------- Original message --------
From: "Peddy, Harmony" <Harmony.Peddy@aarons.com>
Date: 2/11/2016 3:15 PM (GMT-06:00)
To: "Knapp, Damon" <Damon.Knapp@aarons.com>
Cc: "Hafer, Justin" <Justin.Hafer@aarons.com>
Subject: WTD MESSAGE

| Four | -44 | -5858 | 1.85 |

Re: Marketing Today! Case 2:18-cv-01625-SSV-JCW   Document 15-1   Filed 10/09/18   Page 42 of 45 Page 1 of 3

Pg 1 of F

## Re: Marketing Today!

**Peddy, Harmony**
**Sent:** Friday, February 19, 2016 12:23 PM
**To:**   Hafer, Justin

It is only the same today.
It is usually updated every morning but I am off today so can't update it.
I am going to ask Melissa to update it for me today and send it to me so it can be updated tomorrow.
When you say things like, "it is the same every day"
Where do you get that?
I work really hard to update that every day.
One day of it being the same is far from every day.

Harmony V. Peddy
Mississippi Valley Divisional Sales Manager
Cell 615-415-4271
Office 985-781-0214

On Feb 19, 2016, at 10:48 AM, "Hafer, Justin" <Justin.Hafer@aarons.com> wrote:

> When are you updating the chart at bottom of report.  Its the same everyday?
> Shouldn't it be updated daily to let them know where they are?
> I have addressed this multiple times.
> Through yesterday or day behind.  But it needs to be updated.
>
> *Justin Hafer*
>
> Divisional Vice President
> Mississippi Valley Operations
> justin.hafer@aarons.com
> Aaron's Inc
> FAX# 844-309-8815

---

**From:** Peddy, Harmony
**Sent:** Friday, February 19, 2016 7:53 AM
**To:** SaLO Mississippi Valley Operations
**Subject:** Marketing Today!

## Friday!

- ## SM-Make Sales Calls! (Near PIFs — Minimum 40)

## Use the Cell Phone script.

- "Hi _____This is _____from Aaron's!  Did you know we have cell phones starting at only $29.99 a month!
- Because you have such great credit with us, I can offer you the Galaxy S5 LTE or the Note 3 for only $69.99 a month!
- This is a limited offer to only our best customers.
- Would you like me to go ahead and update your information and type you up monthly or

semi-monthly?"

- CSR-Mailing $61 Flyer! (Minimum 150!)
- Both-Call 10 Paid in Fulls Customers and tell them about a product on your Manager Special Board!

- "Hi_____this is____from Aaron's! I just wanted to let you know that you are not using all of your $2,500 credit that you have here with us.
- We have some great specials for the Tax Season and because you are a V.I.P. customer, I can offer you_____ as low as____.(Find out what they need)
- Would you like me to type that up and deliver it C.O.D?

# Bottom 20, e-mail me your 10 Paid in full cell phone calls and pics of your mailers and your PIF calls and the outcomes of your calls by 7:00.

Varriance from your 60 NCD Goal.

| Store | Name | OpnMgt | Region | Cust Dlv | Cust Dlv current | Varriance |
|-------|------|--------|--------|----------|------------------|-----------|
| C1351 | FOREST | 20090626 | Capital | 38 | 26 | -34 |
| C0336 | Jennings | 20010201 | Zydeco | 37 | 35 | -25 |
| C0598 | DeRidder | 20051105 | Zydeco | 37 | 29 | -31 |
| C0691 | Winnfield | 20040701 | Four | 36 | 24 | -36 |
| C0888 | CLINTON | 20061208 | Capital | 36 | 14 | -46 |
| C1579 | Mansfield | 20120406 | Four | 36 | 15 | -45 |
| C1350 | BAY MINETTE | 20090210 | Gulf Breeze | 35 | 25 | -35 |
| C1053 | CANTONMENT | 20071210 | Gulf Breeze | 35 | 20 | -40 |
| C0924 | Jasper | 20051219 | MS BAMA | 35 | 26 | -34 |
| C0058 | JEFFERSON | 19931001 | Big Easy | 34 | 19 | -41 |
| C1596 | Fayette | 20120629 | MS BAMA | 34 | 33 | -27 |
| C0675 | Tallulah | 20040701 | MS River | 33 | 24 | -36 |
| C1442 | KOSCIUSKO | 20100820 | Capital | 32 | 24 | -36 |
| C1131 | DONALDSONVILLE | 20091217 | Red Stick | 31 | 25 | -35 |
| C0510 | Richland | 20031201 | Pearl River | 28 | 30 | -30 |
| C1725 | PLAQUEMINE | 20140221 | Red Stick | 27 | 16 | -44 |
| C1511 | AMORY | 20101216 | MS BAMA | 26 | 36 | -24 |
| C1710 | Stuttgart | 20140711 | S AR | 23 | 17 | -43 |
| C1207 | CLANTON | 20071214 | BAMA | 21 | 27 | -33 |
| C0679 | Columbia | 20040701 | Four | 20 | 24 | -36 |

Harmony V. Peddy

Mississippi Valley Divisional Sales Manager
Office 985-718-4358
Fax-855-411-5774
Cell-615-415-4271
"People may not remember exactly what you did, or what you said,
but they will always remember how you made them feel."

# RTR

# NORTHLAKE
# NEUROLOGICAL
# INSTITUTE
A DIVISION OF PARADIGM HEALTH SYSTEM

Dear Sir or Madame,

Ms. Harmony Peddy is a longstanding patient of mine. At this time, I feel that she is completely disabled due to severe debilitating migraines and associated cognitive difficulties. I have recommended that she refrain from work as I feel that continuing in her current occupation will have continued long term detrimental effects to her health.

Sincerely,

Patrick Glynn, MD